UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| APPSOLEUT CODERS, LLP d/b/a APPSOLEUT GAMES, <br><br> Plaintiff, <br><br> v. <br><br> META PLATFORMS, INC. AND INSTAGRAM, LLC, <br><br> Defendants. | Civil Action No.: <br><br><br> (JURY TRIAL DEMANDED) |

## COMPLAINT

Plaintiff Appsoleut Coders, LLP d/b/a Appsoleut Games ("Plaintiff" or "Appsoleut") by their attorneys, hereby complain of Defendants Meta Platforms, Inc. ("Meta") and Instagram, LLC ("Instagram") (collectively "Defendants"), as set forth below.

## JURISDICTION AND VENUE

1.     This is an action for trademark infringement and unfair competition under federal law and the laws of the State of New York.  This Court has jurisdiction over the federal claims of this action pursuant to 15 U.S.C. §1121 (trademarks), 28 U.S.C. §1331 (federal question), 28 U.S.C. §1332 (diversity) and 28 U.S.C. §1338 (trademarks), and has jurisdiction over the state claims under 28 U.S.C. §1338(b) and further pursuant to its supplemental jurisdiction under 28 U.S.C. §1367.  The state claims asserted herein are so related to the federal claims as to form part of the same case or controversy.

2.     This Court has personal jurisdiction over Defendants because Defendants have a place of business in New York. This Court also has jurisdiction over Defendants

because Plaintiff's claims set forth herein arise out of and relate, *inter alia*, to Defendants' activities in the State of New York. To that end, Defendants have engaged in acts constituting doing business in the State of New York, including in this judicial district and have intentionally directed its tortious activities toward the State of New York, including this judicial district. Defendants have committed acts of intellectual property infringement in New York, including this judicial district.

3.    Venue is proper in this district in that Defendants are corporations subject to personal jurisdiction within this judicial district, and deemed to reside in this district, pursuant to 28 U.S.C. §§ 1391(b) - (d), and in that Defendants have committed acts of infringement in this district.

## THE PARTIES

4.    Appsoleut Coders LLP is a limited liability partnership with a principal place of business at Spaze i Tech Park, Sector - 49, Sohna Road, Tower B2, Office No. 753, Gurgaon, India 122018.

5.    Appsoleut Coders LLP has been in business since 2015 and has been doing business in the United States since its formation.

6.    Since March 22, 2022, Appsoleut Coders LLP has done business as Appsoleut Games.

7.    Appsoleut creates, develops, advertises, and sells mobile applications in the United States and elsewhere.

8.    Appsoleut uploads its applications to both the Apple App Store and the Google Play Store for iOS and Android users, respectively.

2

9.      Appsoleut advertises and sells its products throughout the United States as well as internationally.

10.     Appsoleut utilizes social media platforms such as Instagram to promote its products.

11.     Appsoleut owns trademark rights in its logo ("Appsoleut's Mark" or "its Mark"), pictured below.







3

12.    Appsoleut began using its Mark in commerce in the United States on or before October 2021.

13.    Appsoleut uses its Mark on game products, services, and on social media accounts including Instagram.

14.    The U.S. Patent and Trademark Office has granted Appsoleut a U.S. Trademark Registration for its Mark, namely, U.S. Trademark Registration No. 7,513,370, which issued on September 24, 2024 in International Class 9, for "Downloadable game software for use on mobile and cellular phones, handheld computers, and computers; Downloadable computer game software for use on mobile and cellular phones; Downloadable electronic game software for use on mobile and cellular phones, handheld computers, and computers." *See* Exhibit 1.

15.    Defendant Meta is a Delaware corporation with a principal place of business in Menlo Park, San Mateo County, California. It also maintains offices in New York City.

16.    Defendant Meta is one of the world's largest technology conglomerates, owning Facebook, Instagram, WhatsApp, and related businesses.

17.    Defendant Meta creates, develops, advertises, and sells mobile applications in the United States and elsewhere.

18.    Defendant Meta uploads its mobile applications, including Facebook, Instagram, and Threads, to both the Apple App Store and the Google Play Store, for iOS and Android users, respectively.

19.    Defendant Meta does business throughout the United States as well as

internationally.

20.     Defendant Meta utilizes social media platforms to promote its products.

21.     Defendant Instagram is a Delaware corporation with a principal place of business in Menlo Park, San Mateo County, California.  It also maintains offices in New York City.

22.     Defendant Instagram creates, develops, advertises, and sells mobile applications, including Instagram and Threads, in the United States and elsewhere.

23.     Defendant Instagram uploads its mobile applications, including Instagram and Threads, to both the Apple App Store and the Google Play Store, for iOS and Android users, respectively.

24.     Defendant Instagram does business throughout the United States as well as internationally.

25.     Defendant Instagram utilizes social media platforms to promote its products.

26.     Defendants launched the platform "Threads" in October 2019 for Android and iOS. Defendants discontinued that version of Threads in December 2021. Defendants used the below mark in connection to their initial launch of Threads.



27.     Defendants relaunched Threads on July 5, 2023 for Android and iOS. Defendants launched the web version of Threads app on August 22, 2023. With this relaunch, Defendants began using a new mark shown below (the "infringing mark").



## FACTUAL ALLEGATIONS

28.     Appsoleut is a rapidly growing company that creates, develops, supports, and sells mobile gaming applications throughout the United States and elsewhere.

29.     Appsoleut uses its Mark on all of the mobile applications it has developed. The Mark is the first screen customers see when any of Appsoleut's mobile applications are launched.

30.     Appsoleut's mobile applications have been downloaded over 100 million times worldwide.  Each mobile application includes Appsoleut's Mark.

31.     Appsoleut's mobile applications are available in the United States on both the Apple App Store and the Google Play Store.

32.     Appsoleut's downloads come primarily from the United States.

33.     Appsoleut's use of its Mark has created brand recognition and expanded its customer base.

34.     Appsoleut also displays its Mark, on social media accounts, such as Instagram, YouTube, and TikTok.

35.     Appsoleut has over 110,000 subscribers on YouTube, 100,000 followers on Instagram, and tens of thousands of followers on TikTok, Discord, and other platforms.

36.     Appsoleut is well known in the online community, due in part to the success of its mobile applications.

37.     Appsoleut has attended various conferences where its employees have worn t-shirts with its Mark as shown below.  Appsoleut's employees have also distributed business cards bearing its Mark.



38.     [obscured by image] ...and, increasing its [obscured] ...ng mobile application do...

39.    Appsoleut's customers recognize the Mark as a source indicator and the Mark has goodwill.

40.    Appsoleut's Mark has no similarity to any marks being used in the gaming industry, or to any marks being used to identify social media platforms, other than to Applicant's infringing mark.

41.    In view of, *inter alia*, the millions of downloads of software using Appsoleut's Mark, Appsoleut's social media presence, and so forth, Appsoleut's Mark is strong.

42.    Appsoleut has been using its Mark since at least October 2021.

43.    Defendants began using the infringing mark on or about July 5, 2023.

44.    Defendants use the infringing mark on their Threads' mobile application and on the webpage for Threads: www.threads.net.

45.    Appsoleut is the senior user of the Mark, having used it first, and Defendants are the junior user of the mark, having adopted it after Appsoleut's Mark was already in use.

46.    The infringing mark is extremely similar to Appsoleut's Mark, as shown below:



47.     The infringing mark is extremely similar to Appsoleut's Mark even in a side-by-side comparison.

48.     Trademark law, however, recognizes that ordinary purchasers typically do not undertake side-by-side comparisons but rather rely on imperfect recollections of marks.

49.     Given the strong visual resemblance, consumers encountering the infringing mark after seeing Appsoleut's Mark (or vice versa) would be highly likely to associate one with the other or assume a common source.

50.     The overall impression that consumers are likely to have of the marks when they are viewed sequentially and at different time, is such that consumers are very likely to mistake one for the other.

51.     The parties' goods and services are also related.

52.     Appsoleut's Mark and the infringing mark are both used on downloadable mobile software for smartphones and computers.

53.     Appsoleut's Mark is used on downloadable game software.

9

54.    Defendants' social networking services are closely related to Appsoleut's online gaming services.

55.    Modern gaming is inherently social in nature, blurring the line between a "game" and a "social platform."

56.    The boundary between gaming and social media is porous.

57.    Appsoleut's games encourage social interaction: players can connect with friends, share achievements, join online communities, and even stream content.

58.    Gaming and social media are deeply intertwined:

   a.    Players share game progress or high scores on social networks like Instagram and Facebook.

   b.    Gamers live-stream gameplay on platforms such as Twitch and YouTube, often linking these streams to Facebook/Instagram for promotion.

   c.    Many games integrate in-game chat, friend invites, and community forums, functioning much like a social network within the game.

59.    In other words, gaming is a social experience.

60.    A consumer could easily believe that a social networking app (Threads) and a mobile gaming brand (Appsoleut) emanate from the same source or are affiliated, especially when they share a highly similar logo.

61.    This is even more likely given Defendants' own expansion into the gaming industry, which Appsoleut details below.

62.    Moreover, the trade channels and target consumers for Defendants' Threads service and Appsoleut's games overlap significantly.

10

63. Both parties distribute their offerings via the same online app stores and Internet platforms. For example:

64. <u>Mobile App Stores</u>: Appsoleut's games and Defendants' Threads app are both offered on the Apple App Store and Google Play Store. A consumer downloading from these stores would encounter both the Threads app bearing an "@" logo, and Appsoleut's games bearing an "@" logo.

65. <u>Social Media</u>: Both Appsoleut and Defendants are on social media (Instagram, Facebook, TikTok) via advertising. Defendants, of course, advertises Threads heavily on its own platforms. Appsoleut posts content on those same platforms to reach gamers, and user-generated content is posted on those platforms. Thus, the channels converge.

66. <u>Industry Events and Online Communities</u>: Defendants and Appsoleut have both engaged with the tech/gaming community through events like the MAU Vegas and other expos. Consumers interested in tech, gaming, and social apps are exposed to both companies in similar contexts.

67. The consumer base also overlaps.

68. Appsoleut's target users (mobile gamers) are by and large also users of social media (including Instagram/Threads). A substantial portion of the public uses mobile devices for both gaming and social networking interchangeably.

69. Given this overlap in channels and audience, the use of a nearly identical mark by Defendants in the social media space will inevitably lead consumers to mistakenly assume a connection or common source with Appsoleut's gaming services.

11

70.     Defendant Meta is not an unrelated party in the gaming world; it has aggressively expanded into gaming, further tightening the link between its social media empire and interactive entertainment. For example:

71.     Facebook Gaming (launched 2018): Defendant Meta created a gaming platform on Facebook to compete with Twitch for game streaming audiences.

72.     Oculus / VR Gaming (acquired 2014): Defendant Meta acquired Oculus and invested billions in virtual reality gaming, making Meta a major player in gaming hardware and software.

73.     Cloud Gaming (launched in 2020): Defendant Meta introduced cloud gaming services accessible through Facebook, integrating playable games into the social media experience.

74.     These ventures show that Defendant Meta operates squarely in the gaming industry.

75.     Consumers are also aware that Defendants/Instagram is involved in games.

76.     In fact, many users use their Facebook/Instagram accounts to log into games or watch game streams.

77.     Therefore, when Defendants introduce a new product "Threads" with a logo identical to a logo used in gaming (Appsoleut's), consumers are highly likely to assume Defendants must be behind or associated with that gaming brand.

78.     In short, Defendants' corporate presence straddles both social networking and gaming.

12

79.     This amplifies the likelihood of confusion because the average consumer could reasonably believe that Appsoleut's games are connected to Defendants' ecosystem.

80.     For instance, a consumer might think Appsoleut's games are official "Threads games" from Defendants, or that Appsoleut licensed its logo to Defendants.

81.     Moreover, Appsoleut has had plans to use its mark in gaming communities, a form of social media.

82.     Appsoleut has the right to engage in such use for its gaming software, in accordance with Appsoleut's legal rights of expansion.

83.     Appsoleut has the right to bridge the gap, if any, between the parties.

84.     Appsoleut, however, is wrongfully being restricted from such expansion, as it will only increase the likelihood of confusion between the parties.

85.     Defendants' infringement interferes with Appsoleut's plans, creating likelihood of confusion, including reverse confusion.

86.     Upon information and belief, Defendants were aware of its Mark, including Plaintiff's design, and have deliberately chosen to use, sell, and offer for sale, products with intention to copy or imitate the same.

87.     Appsoleut's Mark was visible on Defendant Meta's own platforms (Instagram, Facebook) well before Defendants' adoption of the infringing mark.

88.     As such, Defendants either knew or should have known of Plaintiff Appsoleut's senior rights.

89.     Appsoleut also informed Defendants of Appsoleut's ownership of the Mark, but Defendants continued to use the Mark.

90.     Defendants' use of the mark has created actual confusion, including, reverse confusion.

91.     Appsoleut's customers have recognized Defendants' infringing mark and notified Plaintiffs that Defendants were using the Mark.  Appsoleut's customers were confused about the connection between Appsoleut and Defendants.

92.     Also, the lower the value or cost of goods or services, and the greater the ease of acquiring them, the less careful a typical consumer can be expected to be.

93.     The parties' respective products and services can be easily and quickly downloaded for free from the Apple App Store and the Google Play Store.

94.     These circumstances indicate that the typical consumer will be less careful in evaluating the source of the goods and services, and, therefore, that there is more likelihood of confusion.

95.     Appsoleut's customer base is likely to become confused about the origin of Plaintiff's products.  Gamers encountering Appsoleut's "@" logo in-app or on app store listings will likely assume it is the same as Defendants' infringing mark and thus think Appsoleut's game is somehow an official product of Defendants or requires a Threads account.

96.     Defendants continued use of the infringing mark also restricts Appsoleut's ability to continue to use and promote its Mark, because to do so, increases reverse confusion.

14

97.     Defendants are much larger companies than Appsoleut with extensive control and ownership of social media outlets.  Appsoleut cannot possibly outspend or out promote Defendants on advertising.  It is not economically or practically feasible.

98.     Defendant has been engaging in extensive use of the infringing mark, such that "the market is swamped."  Defendant, the junior user, has been saturating the market and overwhelming Appsoleut, the senior user.

99.     Defendants' massive marketing and user reach virtually guarantee marketplace confusion.

100.     Defendants' advertising budget and global platform are enormous: in 2024 Meta generated over $160 billion in advertising revenue, and its social platforms have billions of users worldwide.  For example, Facebook has about 2.96 billion monthly active users (MAUs), and Instagram has about 1.6 billion MAUs.

101.     Defendants' use of the Threads branding floods the marketplace and effectively drowns out Appsoleut's presence.

102.     Indeed, over 90% of social media marketers use Meta's advertising platforms, and Defendants' algorithms limit unpaid visibility (organic reach on Facebook is often below 6%).

103.     Appsoleut is a much smaller entity than Defendants, and cannot realistically counter the attention share that Defendants command. In practical terms, consumers will see Defendants' Threads marketing everywhere.

104.    Defendants' dominant social media presence and advertising coupled with its continued use thus creates reverse confusion, i.e., mistake or confusion that Appsoleut is infringing, "Defendants' mark and rights."

105.    Consumers are likely to mistakenly believe that Appsoleut, an Indian company, is wrongfully copying "Defendants' mark," injuring Appsoleut's reputation and impairing its good will.

106.    Additionally, they are likely to mistakenly believe that Appsoleut and its products originate from, are affiliated with, are connected with, and/or are associated with Defendants, and/or that Defendants had acquired Appsoleut.

107.    Indeed, Defendants have acknowledged the likelihood of confusion between Appsoleut's Mark and Defendants' infringing mark.

108.    In October 2023, Meta, through its platform Facebook, unpublished Appsoleut's Facebook account, claiming violations of Community Standards on account integrity and authentic identity, pictured below.



109.    Appsoleut's page was unpublished "because Appsoleut Games goes against our Community Standards on account integrity and authentic identity," i.e., because Appsoleut's Mark is so similar to the mark being used by Defendant Meta.

110.    However, Appsoleut is the senior use of the Mark, with superior rights.

111.    Accordingly, Defendants should have discontinued their use and infringement, not the other way around.

112.    However, Defendants have refused to cease and desist from their wrongful use of Appsoleut's Mark, despite ample notice.

113.    Such notice includes a cease and desist letter to Defendants on November 21, 2023.

114.    Defendants acts create ongoing damage and risks of damage to Appsoleut.

115.    The unwanted association with Defendants harms Appsoleut in numerous ways, including, for example, the following:

116.    <u>Loss of Consumer Goodwill</u>: Gamers and parents who have reservations about Defendant Meta (due to privacy or content concerns) will transfer those fears to Appsoleut's games if they think Appsoleut is part of Defendant Meta. In particular, privacy-conscious gamers who distrust Defendant Meta's data collection practices may avoid Appsoleut's games entirely, mistakenly believing they employ the same invasive tracking as Defendant Meta's products.

117.    <u>Boycotts and Consumer Backlash</u>: Defendant Meta has triggered public backlash and boycotts in some instances. Any unintended perceived link between Appsoleut and Defendant Meta can subject Appsoleut to consumer boycotts or criticism

that have nothing to do with Appsoleut's own behavior. For example, if Defendant Meta faces another major scandal (like Cambridge Analytica), consumers might direct their outrage at any brand they perceive as connected to Defendant Meta – including Appsoleut's games bearing a similar logo.

118.    Industry Reputation Damage: Within the game development community, being associated with Defendant Meta can damage Appsoleut's reputation for creativity and independence. Game developers and potential business partners who view Defendant Meta critically may hesitate to collaborate with Appsoleut if they mistakenly believe it has ties to Defendant Meta.

119.    Investor and Partner Concerns: Appsoleut relies on partnerships, app store relationships, and investor funding to grow. If Appsoleut's brand is seen as entangled with Defendant Meta, some partners might hesitate. For instance, business partners may worry about Defendant Meta's litigation or policy issues spilling over. Advertisers may shy away, fearing that Appsoleut (believed to be related to Defendant Meta) could become embroiled in the next Defendant Meta scandal.

120.    In fact, Appsoleut has already been hampered in securing investment in its company and brand, because of the conflict between Appsoleut's Mark and Defendants' infringing marks.

121.    Loss of Brand Control: If Defendant Meta faces regulatory action or negative press coverage, headlines about the "@ logo" (whether referring to Threads or not) could inadvertently tarnish Appsoleut's reputation through association, leaving Appsoleut powerless to defend its brand image independently.

122.   Defendants have misappropriated Appsoleut's Mark.

123.   Defendants' activities have been wrongful, deliberate, and willful.

124.   Defendants' acts have damaged and continue to damage Appsoleut, Appsoleut's business, and Appsoleut's rights and goodwill in its Mark, and have damaged and continue to damage Appsoleut's ability to expand and obtain investment in its business.

125.   Defendants will continue to so damage Plaintiff Appsoleut unless enjoined by this Court.

## COUNT I
## FEDERAL TRADEMARK INFRINGEMENT
## IN VIOLATION OF THE LANHAM ACT

126.   Appsoleut realleges and incorporates each and every allegation set forth above as if fully set forth and restated herein.

127.   Defendants are engaging in trademark infringement in violation of the Lanham Act.

128.   Section 32(1)(a) of the Lanham Act, 15 U.S.C. § 1114(1)(a), prohibits any person from using in commerce, without the consent of registrant: any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive … .

129.   Appsoleut's Mark is federally registered.  *See* Exhibit 1 (Certificate of Registration for U.S. Trademark Reg. No. 7,513,370).

130.    The acts of Defendants described above constitute federal trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114(1)(a).

131.    There is a likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused as to the source of the goods and services in question.

132.    Defendants knew or should have known of Plaintiff's ownership and use of Appsoleut's Mark prior to Defendant's adoption and use of its confusingly similar infringing mark.

133.    Plaintiff has not authorized Defendants to use their infringing mark.

134.    Defendants' use of their infringing mark has resulted in (and will continue to result in) Defendants unfairly and unlawfully benefiting from Plaintiff's Mark, and is damaging and will continue to damage Plaintiffs' ability to develop and build goodwill and investment in its Mark and business.

135.    Defendants' unauthorized use and promotion of its infringing mark is likely to cause confusion, is causing confusion, and will likely to continue to cause confusion, mistake, and/or deception on the part of consumers as to the source, and nature of the products Defendants are offering, constituting trademark infringement in violation of 15 U.S.C. § 1114.

136.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has been, is now, and will be irreparably injured and damaged by Defendants' aforementioned acts, and unless Defendants are enjoined by the Court, Plaintiff will

suffer further harm to its name, reputation and goodwill. This harm constitutes an injury for which Plaintiff has no adequate remedy at law.

137.    On information and belief, Defendants have acted willfully to usurp Plaintiff's rights, and should be held liable for treble damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a), and Defendants' profits due to their infringement.

**COUNT II**
**FEDERAL UNFAIR COMPETITION**
**IN VIOLATION OF THE LANHAM ACT**

138.    Appsoleut realleges and incorporates each and every allegation set forth above as if fully set forth and restated herein.

139.    Appsoleut has used its Mark in interstate commerce since at least as early as October 2021.

140.    Defendants' use of the infringing mark constitutes false designation of origin and unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a).

141.    Defendants, without the consent of Appsoleut, have used, and will continue to use, the infringing mark in commerce.

142.    The infringing mark is confusingly similar to, and poses a likelihood of confusion with, Appsoleut's Mark.

143.    The unauthorized use by Defendants in commerce of the infringing mark on related and/or substantially similar goods or services to that of Appsoleut is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association, of Appsoleut and Defendants, and/or that Appsoleut, its goods and/or services are affiliated with Defendants,

144.    Defendants' use of the of the infringing mark has also caused and is likely to cause reverse confusion amongst consumers as to the quality and source of Appsoleut's goods and services, and/or that Appsoleut is infringing "Defendants' mark and/or rights."

145.    Defendants' acts of trademark infringement and unfair competition have caused and will continue to cause damage and irreparable harm to Appsoleut, and are likely to continue unabated, thereby causing further damage and irreparable harm to Appsoleut, unless enjoined and restrained by the Court.

146.    Defendants' use of the infringing mark constitutes false designation of origin or false description in representation, and have caused, and are likely to further cause, its Mark to lose its significance as an indicator of origin.

147.    Defendants' acts constitute trademark infringement and unfair competition, and have created and will continue to create, unless restrained by this Court, a likelihood of confusion to the irreparable injury of Appsoleut.

148.    As a result of Defendants' activities, Appsoleut has been damaged in an amount to be ascertained at trial.

149.    Pursuant to 15 U.S.C. § 1116(a), Appsoleut is entitled to permanent injunctive relief to prevent Defendants' continued use of the infringing mark.

150.    Pursuant to 15 U.S.C. § 1117(a), Appsoleut is entitled to damages for Defendants' use of Appsoleut's trademark, in an amount to be ascertained at trial; an accounting of profits made by Defendants; and a recovery of Appsoleut's costs of this action.

## COUNT III
## COMMON LAW TRADEMARK INFRINGEMENT AND
## UNFAIR COMPETITION

151.    Appsoleut realleges and incorporates each and every allegation set forth above as if fully set forth and restated herein.

152.    Appsoleut has used its Mark in connection with downloadable game software for use on mobile and cellular phones, handheld computers, and computers, since at least October 2021.

153.    Its Mark is an arbitrary mark, and is distinctive of the goods and services of Appsoleut.

154.    Appsoleut has used its Mark in every state of the United States.

155.    Appsoleut is the rightful owner of common law rights in its Mark in every state where it has used its Mark.

156.    Defendants, without the consent of Appsoleut, has used, and will likely continue to use, the infringing mark in commerce.

157.    The infringing mark is confusingly similar to its Mark.

158.    The unauthorized use by Defendants in commerce of the infringing mark on goods or services substantially similar to that of Appsoleut has and is likely to cause confusion and the mistaken belief that Defendants' activities, goods, and services originate from, are sponsored by, or are in some way associated with Appsoleut or that Appsoleut, its goods and/or services are affiliated with Defendants.

159.    Defendants' use of the infringing mark has also caused and is likely to further cause reverse confusion amongst consumers as to the quality and source of Appsoleut's goods and services and constitutes unfair competition.

160.    Defendants' use of the infringing mark constitutes false designation of origin or false description in representation, and has caused, and is likely to further cause, its Mark to lose its significance as an indicator of origin.

161.    Defendants' acts constitute common law trademark infringement and unfair competition, and have created and will continue to create a likelihood of confusion to the irreparable injury of Appsoleut, unless restrained by this Court.

162.    Defendants' use of the infringing mark is likely to cause confusion, mistake, deception, and reverse confusion amongst consumers as to the affiliation, connection, or association of Defendants with the Appsoleut's goods and services.

163.    As a result of Defendants' above stated activities, Appsoleut has been damaged in an amount to be ascertained at trial.

164.    Defendants' acts are a violation of the laws of each state in which Appsoleut and Defendants both conduct business, including, but not limited to, New York.

**COUNT IV**
**UNFAIR COMPETITION**
**UNDER NEW YORK COMMON LAW**

165.    Plaintiff repeat and re-allege each and every allegation contained in the preceding paragraphs, as if fully set forth herein.

166.    This claim arises under the common law of the State of New York.  *See e.g.*, *Luv n' care, Ltd. v. Walgreen Co.*, 695 F. Supp. 2d 125, 135 (S.D.N.Y. 2010).

167.    This Court has jurisdiction over this claim pursuant to 28 U.S.C. §1367.

168.    Plaintiff has created its Mark and design, through extensive time, labor, skill, and money.

169.    Defendants have engaged in unfair competition under New York common law by Defendants' bad faith misappropriation of the labors and expenditures of Plaintiff, which is likely to cause confusion.

170.    Defendants have misappropriated business value of Plaintiff, and have misappropriated the results of Plaintiff's labor and skill and the expenditures of Plaintiffs, by marketing and selling goods that incorporate its Mark of Plaintiff's without its authorization.

171.    Defendants have used the infringing mark on goods sold in commerce without compensating Plaintiff, and have done so in bad faith.

172.    Defendants have used the infringing mark in competition with Plaintiff, gaining an unfair advantage, because Defendants bore little or no burden of expense of Plaintiff's creation, development, marketing, and promotion of its Mark.

173.    Defendants have engaged in bad faith misappropriation of the labors of Plaintiff in creating, marketing, promoting, and selling of their products bearing the infringing mark, which misappropriation is likely to cause confusion, to deceive purchasers as to the origin of the goods, and to dilute the value of Appsoleut's Mark and the value of Plaintiff's products bearing the same.

174.    Defendants' actions have caused significant commercial damage to Plaintiff.

175.    Defendants' conduct is illegal and actionable under the common law of unfair competition of the State of New York.

176.    Plaintiff has been injured by Defendants' illegal actions and are entitled to the remedies provided under New York law.

## COUNT V
## TRADEMARK DILUTION
## <u>UNDER NEW YORK LAW</u>

177.    Plaintiff repeat and re-allege each and every allegation contained in the preceding paragraphs, as if fully set forth herein.

178.    Defendants' use of Plaintiffs' Mark causes dilution of Plaintiff's Mark  for Plaintiff's goods and related goods, under New York law.

179.    New York law does not require a showing of a famous mark for a dilution claim.

180.    Defendants' use of Plaintiff's Mark to identify the Defendant's goods and services, seriously risks the possibility that the Mark will lose its ability to serve as a unique identifier of Plaintiff's products and services.

181.    Defendants' use constitutes unlawful blurring of Plaintiff's Mark.

182.    Considering the widespread reach of Defendants' products and services, this is a serious and ongoing concern.

183.    As such, Defendants' use of Plaintiff's Mark creates dilution by blurring.

184.    Defendants use also creates dilution by tarnishment.

185.    <u>Meta's Controversial Reputation</u>: In recent years, Defendants (Facebook/Instagram) has been the subject of numerous scandals and public criticisms that have severely damaged its reputation with consumers, regulators, and within the tech industry.  These have included the following:

186.    <u>Data Privacy Violations</u>: Defendants' flagship, Facebook, faced a massive data breach and privacy lawsuit resulting in a $725 million settlement in 2023. More alarmingly, Defendant Meta was fined a record €1.2 billion by the EU for GDPR violations related to its transfer of EU users' data to the United States. Shortly after Threads launched, it was immediately criticized for its invasive data collection practices, with public reports that it collected extensive personal information including health and financial data from users.

187.    <u>Misinformation and Content Moderation Failures</u>: Defendant Meta has been accused of allowing the spread of fake news, extremist content, and enabling election interference on its platforms. These issues have triggered congressional hearings, whistleblower testimony, and global calls for greater regulation. Threads itself was flagged by observers within weeks of its launch as a potential new vector for misinformation and harmful content.

188.    <u>Censorship</u>.  Defendant Meta has also been accused of censorship of speech based on content.  In January 2024, Defendant Meta agreed to pay a roughly $25 million settlement to end a 2021 lawsuit which argued that its social media platform wrongfully censored President Donald Trump by suspending his Facebook and Instagram accounts.

189.    <u>Cambridge Analytica Scandal</u>: Also damaging to Defendant Meta's reputation was the Cambridge Analytica scandal, where the personal data of millions of Facebook users was harvested without consent and used for political advertising. This incident fundamentally altered public perception of Facebook/Meta as a trustworthy platform.

190.    <u>Perceived Monopolistic Behavior</u>: Defendants have also been repeatedly accused of monopolistic, and unfair trade practices. Defendant Meta's aggressive tactics (buying or cloning competitors, exploiting user data) have drawn antitrust scrutiny and public backlash. Many view Defendant Meta as an entity that prioritizes profits over societal good.

191.    Meanwhile, Appsoleut's reputation in gaming is positive and untarnished. Appsoleut is known for quality games and fair practices, avoiding the controversies that have plagued Defendant Meta.

192.    However, if consumers begin associating Appsoleut's mark with Defendant Meta (through the Threads confusion), Appsoleut risks suffering "guilt by association."

193.    The importance of preserving a clean reputation is paramount. Here, the association of Appsoleut's mark with Defendant Meta's highly polarizing brand is demonstrably damaging.

194.    Given Defendant Meta's documented pattern of controversies and the likelihood of future incidents, any confusion or association between Threads and Appsoleut will severely tarnish Appsoleut's hard-earned positive reputation.

195.    For Plaintiffs' Mark to be linked to products and services of Defendants, products and services which have been portrayed in such an unwholesome or unsavory context, seriously risks the result that the public will associate the lack of quality or lack of prestige in the Defendant's goods and services with Plaintiffs' goods and services, causing tarnishment of Plaintiff's Mark.

196.    Defendants' conduct, including, its dilution by blurring and tarnishment, is illegal and actionable under the law of the State of New York.

197.    Plaintiff has been injured by Defendants' illegal actions and are entitled to the remedies provided under New York law.

## COUNT VI
## CANCELLATION OF DEFENDANTS'
## TRADEMARK APPLICATIONS

198.    Plaintiff repeats and re-alleges each and every allegation set forth in the preceding paragraphs, as if fully set forth herein.

199.    Defendants have filed trademark applications to attempt to register their infringing mark in the U.S. Patent and Trademark Office.

200.    These applications are pending, and include, U.S. Trademark Application Serial Nos. 98073542, 98073547, 98073548, and 98073550.

201.    These applications are not registrable to Defendants, for all of the reasons set forth above, including, but not limited to, Plaintiff's registered mark.

202.    Plaintiff has filed an opposition against U.S. Trademark Application Serial No. 98073542.

203.    Plaintiff has also duly and timely filed requests for an extensions of time to oppose Defendants' remaining trademark applications (Serial Nos. 98073547, 98073548, and 98073550).

204.    Plaintiff submits that this Court has the authority to determine the right to registration of Defendants' pending applications with respect to the prior registration of Plaintiff.  In particular, the Lanham Act, 15 U.S.C. § 1119, provides that "[i]n any action involving a registered mark the court may determine the right to registration, order the cancelation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action."

205.    In view of the facts and circumstances, Defendants do not have the right to registration of Defendants' pending applications.  Accordingly, Plaintiff respectfully submits that this Court should determine Defendants' lack of right to registration and enjoin Defendants from further pursuing registration of Defendants' applications.

## JURY TRIAL DEMANDED

206.    Appsoleut hereby demands a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Appsoleut demands judgment against Defendants as follows:

A.    That Defendants be found to have willfully infringed Plaintiffs' rights under federal and state law;

B.    That Defendants, their subsidiaries, affiliates, franchisees, licensees, officers, agents, sales, representatives, servants, employees, associates, successors, and

assigns, and all entities and persons acting under its control, by, through, under, or in active concert or in participation with Defendants, pursuant to 15 U.S.C. § 1116, be permanently enjoined from:

    1.    Using the infringing mark or any other mark that is likely to cause confusion, mistake or deception with Appsoleut and/or the Appsoleut Mark;

    2.    Using any mark or doing any act or thing likely to confuse the public that Defendants' goods or services are in any way connected with Appsoleut, including, but not limited to, using on the worldwide web the infringing mark, or any mark or trade name confusingly similar thereto, or printing, publishing, promoting, lending or distributing any advertisement, whether written or video, which uses the Infringing Mark, or any mark confusingly similar thereto.

C.    The Defendants deliver up for destruction all goods, advertising, literature, and other forms of promotional material bearing or showing the infringing mark or a confusingly similar mark pursuant to 15 U.S.C. § 1118;

D.    That Defendants must pay Appsoleut such damages as Appsoleut has sustained as a result of Defendants' infringement of the Appsoleut Mark.

E.    That Defendants must change the logo of its Threads platform to one that is not confusingly similar to Appsoleut Mark or logo;

F.    For an Order directing the U.S. Trademark Office to refuse to register Defendants' U.S. Trademark Application Serial Nos. 98073542, 98073547, 98073548, and 98073550;

G.      That Defendants must account for all gains, profits, and advantages derived from its acts of infringement pursuant to 15 U.S.C. §1117 or, at Appsoleut's option, the damages found in 15 U.S.C. §1117(c);

H.      Finding this an exceptional case under 15 U.S.C. § 1117, and awarding Appsoleut a sum above the amount found as actual damages not exceeding three times such amount, and its reasonable attorneys' fees;

I.      That Defendants must pay Appsoleut its costs and disbursements in bringing this action and prejudgment and post-judgment interest as appropriate pursuant to 15 U.S.C. § 1117;

J.      That Defendants must pay punitive damages under state law for their actions complained of herein;

K.      That Defendants must report to this Court of its compliance of the foregoing within thirty (30) days of the judgment; and

L.      For such other and further relief that the Court deems just and proper.

Dated: June 4, 2025                          _/s/Morris E. Cohen_____
                                             Morris E. Cohen (MC-4620)
                                             Lee A. Goldberg (LG-9423)
                                             GOLDBERG COHEN LLP
                                             1350 Avenue of the Americas, 3rd Floor
                                             New York, New York 10019
                                             (646) 380-2087 (phone)
                                             (646) 514-2123 (fax)
                                             MCohen@GoldbergCohen.com
                                             LGoldberg@GoldbergCohen.com